IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SUSAN TILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:14-CV-721-WKW |
| | ) | [WO] |
| LINCOLN NATIONAL LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this suit pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Before the court is Defendant Lincoln National Life Insurance Company's ("Lincoln") Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 56 (Doc. # 36) and brief in support (Doc. # 37). Plaintiff responded (Doc. # 56-1), and Lincoln filed a brief in reply to Plaintiff's response (Doc. # 62-1). Also before the court is Plaintiff's Motion for Summary Judgment (Doc. # 39) and brief in support (Doc. # 40). Lincoln responded (Doc. # 58), and Plaintiff filed a brief in reply to Lincoln's response (Doc. # 64-1). After careful consideration of the evidence, the parties' briefs, and the relevant law, the court concludes that Plaintiff's motion is due to be denied and Defendant's motion is due to be granted.

# I.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over Plaintiff's ERISA claims pursuant to 28 U.S.C. § 1331.  This case involves federal questions arising under ERISA, over which the court has original jurisdiction pursuant to 29 U.S.C. § 1132(e).  The parties do not contest personal jurisdiction or venue.

# II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean–Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id*.  Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials.

. . .  [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").  If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

Cross-motions for summary judgment "must be considered separately," and "each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538-39 (5th Cir. 2004); *see also Bricklayers, Masons & Plasterers Int'l Union of Am., Local Union No. 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)[1] ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.").  In some cases, "[c]ross motions for

_____

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

summary judgment may be probative of the nonexistence of a factual dispute." *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983). However, the existence of cross motions for summary judgment "'do[es] not automatically empower the court to dispense with the determination whether questions of material fact exist.'" *Ga. State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (quoting *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983)). This is so because "each party moving for summary judgment may do so on different legal theories dependent on different constellations of material facts. Indeed, cross-motions for summary judgment may demonstrate a genuine dispute as to material facts as often as not." *Bricklayers*, 512 F.2d at 1023.

"'[W]hen both parties proceed on the same legal theory and rely on the same material facts[,] the court is signaled that the case is ripe for summary judgment." *Shook*, 713 F.2d at 665. Even then, however, "[a] court may discover questions of material fact even though both parties, in support of cross-motions for summary judgment, have asserted that no such questions exist. . . . Thus, before the court can consider the legal issues raised by the parties on cross-motions for summary judgment, it must have no doubt as to the relevant facts that are beyond dispute." *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 824 (11th Cir. 1984) (adopting order of district judge on summary judgment).

# III.  BACKGROUND

## A.  <u>Procedural Background</u>

Plaintiff was employed as a radiology technologist by Gilliard Health Services, d/b/a Evergreen Medical Center ("Gilliard").  (Doc. # 40, at 4.)  Gilliard purchased long term disability insurance for its employees, including Plaintiff.  (Doc. # 37, at 2.)  Gilliard was the plan administrator and plan sponsor for the disability insurance.  (Lincoln/Till 000063.)[2]

Plaintiff has a long history of back problems and has not worked since December 5, 2012, when she exacerbated her back condition.  (Doc. # 40, at 5–6.)  She has been diagnosed with spondylotic[3] disease of the thoracic spine and multilevel spondylotic disease of the lumbar spine.  (Lincoln/Till 000890.)  On February 6, 2013, Plaintiff applied for long term disability benefits under the disability plan.  (Lincoln/Till 001120–21.)  Lincoln denied the claim because it determined that the "medical documentation contained in [her] claim file [did] not support Total Disability as defined by [the] policy."  (Lincoln/Till 001001.)  Plaintiff administratively appealed the decision twice, and Lincoln upheld the denial of benefits on both appeals.  (Lincoln/Till 000075, 001059.)

---

[2] Unless otherwise noted, the Lincoln/Till batestamp numbers refer to the administrative record, which has been filed under seal at Doc. # 46.

[3] Spondylosis is a degenerative condition affecting the spine.  *See* Kimberley Middleton and David E. Fish, PMC U.S. NATIONAL LIBRARY OF MEDICINE NATIONAL INSTITUTES OF HEALTH, *Lumbar Spondylosis: Clinical Presentation and Treatment Approaches*, (Mar. 25, 2009), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2697338/.

On August 1, 2014, Plaintiff filed her complaint alleging that Lincoln is a plan fiduciary charged with certain duties under ERISA and that Lincoln has breached several of its duties.  (Doc. # 1.)  She also alleges that Lincoln is a *de facto* plan administrator and that Lincoln violated federal law by failing to provide her requested documents that Lincoln used to support its decisions to deny her benefits.  The complaint does not set out numbered counts against Defendant. Plaintiff seeks to recover "all benefits under the Plan to which she may be entitled," "waiver of premium[s] . . . under disability, life, accidental death and dismemberment or accident policies," and "any other benefits available through [t]he Plan."  (Doc. # 1, at ¶ 2.)  All of the benefits sought by Plaintiff are based on the court determining that she is "disabled."  (Doc. # 1, at ¶ 2.)  Plaintiff further seeks an award of past benefits, prejudgment interest, costs and expenses including attorney's fees, a declaratory judgment concerning Plaintiff's entitlement to future benefits, and other injunctive relief.  (*See* Doc. # 1, at 17–18.)  She requests, as an alternative form of relief, that the court "remove Lincoln from its fiduciary role in the administration of [t]he Plan(s), and to appoint a special master to substitute for [Lincoln]."  (Doc. # 1, at 17–18.)

Lincoln filed a motion to dismiss seeking dismissal of Plaintiff's claims under § 502(a)(3) and § 502(c)(1)(B).  (Doc. # 9.)  The court granted dismissal of Plaintiff's claim under § 502(a)(3) that alleged that Lincoln breached a fiduciary

duty. It denied the motion as to her claim arising under § 502(c)(1)(B) that Lincoln, as *de facto* plan administrator, failed to provide her with requested documents that supported its decisions to deny benefits. (Doc. # 21, at 14–15.) The court found that "[t]he question of whether a defendant is acting as plan administrator is fact intensive and [is] better decided at a later stage of this litigation." (Doc. # 21, at 15.)

Lincoln now seeks summary judgment on Plaintiff's remaining claims, which are a § 502(a)(1)(B) claim to recover benefits and a § 502(c)(1)(B) claim for failure to provide documents. [4] (Doc. # 37, at 2.) Lincoln argues that it is entitled to summary judgment because Plaintiff failed to provide sufficient proof of Total Disability as defined by the plan and that the statutory penalties under § 502(c)(1)(B) are only permitted for plan administrators, and it was not the plan administrator or *de facto* plan administrator. Plaintiff seeks summary judgment on her claims because she asserts that (1) she is disabled as a matter of law, (2) Lincoln denied her a full and fair review, (3) Lincoln's denial of benefits was arbitrary and capricious, and (4) as *de facto* plan administrator, Lincoln violated ERISA by failing to produce the entire ERISA record at Plaintiff's request and

---

[4] Lincoln's summary judgment briefing focuses on long-term disability benefits. (*See*, *e.g.*, Doc. # 37, at 2 n.1.) Plaintiff has not indicated that any other benefits are at issue. On this record, Plaintiff's generic allegations seeking entitlement to "all benefits . . . to which she may be entitled" is insufficient to put any other benefits at issue. In any event, Plaintiff has not identified any other benefits to which she says she is entitled.

therefore penalties are due Plaintiff under § 502(c)(1)(B).  (Doc. # 40, at 14–16, 33.)

## B.   **Factual Background**

Plaintiff's back problems started when she had a laminectomy in 1982. (Lincoln/Till 000891.)   An MRI of her lumbar spine on September 25, 2003, shows degenerative changes, loss of disc height, and mildly bulging discs. (Lincoln/Till 000751.)  Clinical notes from Dr. John E. Hackman dated October 7, 2003, stated that Plaintiff had back pain with burning and numbness down both legs and that her x-ray showed minor spinal stenosis.  Follow-on notes from Dr. Hackman indicate that an MRI of the neck showed degenerative changes. (Lincoln/Till 000744.)   A November 11, 2003 MRI indicates stenosis, bony spurring, mild disc bulging, and congenital narrowing.   (Lincoln/Till 000750.) Despite these problems, Plaintiff was able to work.  (Doc. # 40, at 5–6.)

In 2004, Plaintiff began working as a radiology technologist for Gilliard. (Doc. # 40, at 4.)   Plaintiff's job summary, according to her employer, is to "operat[e] conventional, fluoroscopic, or portable radiology equipment to obtain routine radiographs of designated body portions according to physicians' specifications. . . . position[] patients and adjust[] x-ray equipment to correct setting for each examination. . . . [and] [a]ssist[] physicians in carrying out examinations by mixing and preparing contrast media, and assisting in sterile

procedures." (Lincoln/Till 000329.) Her employer indicates that the physical demands of her job include lifting up to ten pounds more than two-thirds of the time, lifting up to twenty-five or fifty pounds from one-third to one-half of the time, and lifting up to one hundred pounds up to one-third of the time. The position also includes standing or walking up to two-thirds of the time. (Lincoln/Till 000332.)

An x-ray of Plaintiff's back on March 26, 2008, shows mild multi-level dischogenic change throughout her cervical spine and severe multi-level dischogenic change along with compression deformity of her thoracic spine. (Lincoln/Till 000817.) A lumbrosacral spine study on April 4, 2012, revealed degenerative arthritis of the lumbar spine and osteophytes. (Lincoln/Till 000837.)

Plaintiff continued to work until December 4, 2012, when she exacerbated the condition of her back by assisting and repositioning a patient. (Doc. # 40, at 6.) She sought treatment at Evergreen Primary Care on December 5 and December 10, 2012. The practitioner[5] diagnosed Plaintiff with low back pain with radiculopathy, prescribed pain medications, referred her for an MRI, and set up an appointment with Dr. Barry Lurate. (Lincoln/Till 001077–79.) Dr. Lurate is an orthopedic doctor who works at Pensacola Orthopaedics & Sports Medicine in Pensacola, Florida. (Lincoln/Till 000891.)

---

[5] The signature on the practitioner's signature line is illegible.

Plaintiff had the MRI on December 12, 2012, and the report from the MRI described disc herniation at L5-S1 producing spinal stenosis and minimal narrowing of the foramina, a posterior bulge at L4-5 that slightly narrowed the foramina, and a posterior bulge of the disc producing spinal stenosis and bilateral foraminal encroachment at L2-3 and L3-4.  (Lincoln/Till 001118–19.)   Plaintiff first visited Dr. Lurate on December 18, 2012.  At the visit, he checked the MRI but found it mostly unreadable.  He noted that x-rays indicated multilevel degenerative disc disease throughout the lumbar spine and into the lower thoracic spine and that the MRI highlighted the multilevel spondylotic disease of the spine. (Lincoln/Till 000891–92.)

Dr. Lurate's notes from the December 18, 2012 visit indicate that he performed a physical exam.  He said that the pain was localized mid back and thoracic back and then into the lower lumbar area, with no mass effect, no scoliosis, and no paraspinal muscle spasm.  He found her voluntary range of motion to be poor on flexion and extension, but that Plaintiff tolerated hip rotation well without pain and that straight leg raise and heel stretch were both negative.[6] He stated that, although Plaintiff complained of numbness in her toes and tingling dysesthesias in the posterolateral thigh and anterolateral leg, those symptoms were not present that day.  Dr. Lurate also notated that Plaintiff's deep tendon reflexes in

---

[6] Negative indicates that Plaintiff did not experience pain.

her knees and ankles were normal[7] and that there were no motor or sensory deficits.  Dr. Lurate diagnosed Plaintiff with chronic low and mid back pain with right lumbar radiculitis and an elevated BMI.  He recommended avoiding surgery if possible, referred Plaintiff to physical therapy for core strengthening, fitted her for a lumbar corset to help with the pain, and referred Plaintiff to a pain management specialist.  (Lincoln/Till 000892.)

Plaintiff had another MRI on January 16, 2013.  The report states that the thoracic cord signal appears normal, there are disc desiccation and small disc bulges at several levels of the thoracic spine, no spinal stenosis is noted, vertebral body heights are within normal limits, and thoracic spine alignment is unremarkable.  It indicates a diagnosis of multilevel thoracic spondylosis. (Lincoln/Till 001117.)

On January 22, 2013, Plaintiff had a follow-up appointment with Dr. Lurate. He stated that her dysesthesias down the right lower extremity was "largely improved," although he mentioned that her primary complaint was still right low back pain with occasional numbness in her toes.  He reviewed the January 16, 2013 MRI and said that it shows spondylotic disease of the thoracic spine.  He again said that surgery was not a good option and said that they would set Plaintiff

---

[7] The notes state that "DTRs are 2+ in the knees and ankles."  A grade of 2 for deep tendon reflexes is normal and a grade of 3 is increased but normal.  *See* A. Chandrasekhar, MD, *Muscle Stretch Reflexes of the Upper and Lower Extremities*, LOYOLA UNIV. MED. EDUC. NETWORK, http://www.meddean.luc.edu/lumen/meded/medicine/pulmonar/pd/pstep56.htm (last visited Apr. 18, 2016).

up with pain management in Pensacola.  No physical exam is indicated on Dr. Lurate's notes from the January 22, 2013 visit.  (Lincoln/Till 000890.)

Dr. Lurate referred Plaintiff to physical therapy two to three times a week for four weeks.  (Lincoln/Till 000839–54.)  Plaintiff attended physical therapy at Evergreen Medical Center six times from January 7, 2013, through January 24, 2013, when she stopped attending.  At the initial appointment, she had a lumbar range of motion of 25% and strength of two out of five.  Repetition sets for her exercises began with ten repetitions for each exercise.  (Lincoln/Till 000841–42.)  On January 10, 2013, Plaintiff was able to increase her repetitions of each exercise and add standing curls; she continued to add repetitions each session, up to fifteen repetitions on January 14 and twenty repetitions on January 21, 2013.  She also showed progress on her exercises from two minutes initially up to three minutes on January 16, 2013.  The notes showed that she cried out in pain and grimaced during the progressive exercise.  The notes from January 21, 2013, indicate that her pain level remained at a constant of about five out of ten from the initial session through that date.  (Lincoln/Till 000851.)

On January 24, 2013, Plaintiff attended her last physical therapy session.  At the session, she stated that she would be joining a wellness center so that she could continue her exercises at home.  The therapist also initiated dynamic stretching during treatment that day.  Plaintiff stopped attending physical therapy after six

sessions. The notes from the therapist indicate that she had met her short-term goals of a 50% lumbar range of motion, worst pain level at seven out of ten, and strength at a three-minus out of five. (Lincoln/Till 000853–54.)

Dr. Jeffrey Voreis is Plaintiff's primary care doctor. The records from Dr. Voreis's office show visits on January 24, 2013, February 7, 2013, and March 4, 2013. On January 24, 2013, Dr. Voreis indicated in the physical exam section of the notes that Plaintiff had a tender mid and low back and positive straight leg raise.[8] (Lincoln/Till 000498.) At the February 7, 2013 visit, he noted that she limped on her left leg and could not sit, stand, lift, push, or pull for any period of time, that she had difficulty with performing activities of daily living (ADLs) and needed her husband's help with them, and that she had paraspinal muscle spasm. (Lincoln/Till 000497.) He prescribed Tramadol for the pain. On March 4, 2013, Dr. Voreis indicated that Plaintiff still had severe back pain, but could function with Tramadol. Her husband continued to help her perform her ADLs, and she had a belated positive on the straight leg raise.

Dr. Voreis filled out the physician's statement for Plaintiff's initial long-term disability claim. On the undated[9] statement, he indicated that Plaintiff could not lift, push, pull, climb, lift patients, pull on patients, or climb stairs. He also

___

[8] Positive indicates that Plaintiff was in pain when Dr. Voreis conducted the test.

[9] Dr. Voreis did not date the form when he signed it. He did indicate that Plaintiff's most recent appointment with him was on February 7, 2013, therefore it was most likely filled out prior to her March 4, 2013 office visit.

stated that her recovery was uncertain and that she appeared to have been at a level of intractable pain for three months.  (Lincoln/Till 0001037–39.)

On March 4, 2013, he filled out an abilities form on which he indicated that she could occasionally carry up to twenty pounds, sit, stand, walk, bend, drive, finger, handle, operate foot controls, and climb a few steps, but never kneel.[10] (Lincoln/Till 001090.)  On March 5, 2013, Dr. Voreis wrote an office note about the condition of Plaintiff's back.  In the note, he stated that she limited her daily activities due to the pain.  Before the injury on December 4, 2012, her back pain would return to a "baseline," but after that date, the pain was only manageable when she was on Tramadol.  However, he said that even with the Tramadol, she was limited to her ADLs.  (Lincoln/Till 000495.)

On April 12, 2013, Dr. E. Arnold Johnson evaluated Plaintiff for her Social Security benefits claim.  He indicated that she declined to perform any task during her physical exam, because she claimed that she could not do it.  He said her grip strength was fifteen pounds in her right hand and five pounds in her left hand.  He also stated that surgery was not an effective treatment option due to the extensive nature of the disc disease shown on the MRI studies.  (Lincoln/Till 000677.)  He found that Plaintiff could only sit or stand five to ten minutes without having to change positions to relieve the pain, and was only able to tolerate thirty minutes

---

[10] The terminology for Plaintiff's physical abilities is as it was used on the forms and by the doctors and parties throughout the administrative record.

seated in a car at one time.  (Lincoln/Till 000678.)   In his opinion, Plaintiff is "unable to work at all."  (Lincoln/Till 000677.)

Dr. Voreis performed a long term disability exam for Plaintiff's Social Security Disability claim.   His letter about the results of the examination and Plaintiff's physical condition is undated, and the last page of the attached medical source statement is unsigned and undated.[11]  (Lincoln/Till 000689–90, 000696.)  In the examination letter, Dr. Voreis noted that Plaintiff is only able to sit for thirty minutes, walk for twenty to thirty minutes, and stand for ten to twenty minutes.  He stated that when Plaintiff takes Tramadol she is "functional," but he does not indicate what he means by functional.

Dr. Voreis indicated that Plaintiff could not abduct her shoulders beyond ninety degrees without extreme discomfort.  He also indicated that she appeared to have bilateral carpel tunnel syndrome, a grip strength of three and a half out of five, and that she was too weak to elevate to her toes or tandem walk.   In his opinion, Plaintiff has "progressive lumbar problems with multi-level disc disease, spondylosis, and spinal stenosis . . . with extensive herniated discs and spinal stenosis."  (Lincoln/Till 000690.)

---

[11] A clinical assessment of pain that is attached to the examination and medical source statement is signed and dated March 4, 2014.  (Lincoln/Till 000697.)   The Social Security determination also references the March 2014 assessment by Dr. Voreis.  (Lincoln/Till 000374.)

On the attached medical source statement, Dr. Voreis indicated that Plaintiff could occasionally lift up to ten pounds and carry up to two to three pounds. He noted that she could sit, stand, or walk for twenty to thirty minutes uninterrupted, that she used a cane to walk when she was unaccompanied on uneven ground, and that she frequently drops things because her hands go numb. He stated that during an eight-hour work day, she is able to sit for two hours, stand for one hour, and walk for two hours. (Lincoln/Till 000692.) Dr. Voreis said that Plaintiff cannot reach overhead, push/pull, climb a ladder or scaffold, balance, stoop, kneel, crouch, or crawl. He also indicated that she is occasionally able to reach, handle, finger, feel, operate foot controls, and climb ramps and up to four steps. (Lincoln/Till 000693–94.) He noted that she was likely to be absent from work for up to four days per month due to the impairment. (Lincoln/Till 000696.) The form has several locations for the physician to indicate medical or clinical findings to support these restrictions, but Dr. Voreis did not fill in any of these sections. (Lincoln/Till 000691–96.) He does not explain the basis for the increased restrictions from his previous assessment of Plaintiff in March 2013.

The Social Security administrative law judge determined that beginning December 5, 2012, Plaintiff was disabled as defined in the Social Security Act. When making the decision, he gave "great weight" to Dr. Voreis's and Dr.

Johnson's assessments, and listed all of the restrictions Dr. Voreis had placed on her physical activity.  (Lincoln/Till 000367–76.)

## C.   **The Plan**

The Summary Plan Description designates Gilliard as the plan administrator. (Lincoln/Till 000063.)  The Plan grants discretionary authority to Lincoln under its claims provisions:

> **COMPANY'S DISCRETIONARY AUTHORITY.**  Except for the functions that the Policy clearly reserves to the Policyholder or Employer, the Company has the authority to manage the Policy, interpret its provisions, administer claims and resolve questions arising under it.  The Company's authority includes (but is not limited to) the right to:
> 1.   establish administrative procedures, determine eligibility and resolve claims questions;
> 2.   determine what information the Company reasonably requires to make such decisions; and
> 3.   resolve all matters when an internal claim review is requested.
> Any decision the Company makes in the exercise of its authority shall be conclusive and binding; subject to the Insured Employee's rights to request a state insurance department review or to bring legal action.

(Lincoln/Till 000049.)  The Plan further provides that:

> **"Total Disability" or "Totally Disabled"** will be defined as follows.
> 1.   During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of his or her regular occupation.
> 2.   After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow.

> The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability.

(Lincoln/Till 000054.)   The "**ELIMINATION PERIOD** means the number of days of Disability during which no benefit is payable."   (Lincoln/Till 000042.) The elimination period under Plaintiff's policy is ninety days.   (Lincoln/Till 000038.)   Main duties are defined as follows:

> **MAIN DUTIES** or **MATERIAL AND SUBSTANTIAL DUTIES** means those job duties which:
> 1.     are normally required to perform the Insured Person's regular occupation; and
> 2.     cannot reasonably be modified or omitted.
> It includes those main duties as performed in the national workforce; **not** as performed for a certain firm or at a certain work site.

(Lincoln/Till 000044.)   Under the definition of "**Regular Occupation** or **Own Occupation**," the policy provides that the definition "includes the main duties of that occupation as performed in the national workforce; **not** as performed for a certain firm or at a certain work site."  (Lincoln/Till 000045.)

The claims procedures in the policy require that a "[p]roof of claim . . . be provided at the Insured Employee's own expense.   It must show the date the Disability began, its cause and degree."   (Lincoln/Till 000047.)   The policy provides what documentation is required to support a claim and also that proof of continued disability must be provided upon Lincoln's request in order for benefits to continue.

D.   **Plaintiff's Claim**

a.   ***Initial Claim***

Plaintiff filed her claim for long term disability benefits under the plan on February 6, 2013. (Lincoln/Till 001120–21.) In order to review the claim, Lincoln requested an employee statement from Plaintiff, a statement from her employer, a statement from her attending physician, a signed authorization, and a formal job description from her employer. (Lincoln/Till 001116, 001127.) It also requested medical records from Dr. Yearwood,[12] Dr. Lurate, and Dr. Voreis. (Lincoln/Till 001115.) Lincoln determined that no benefits were payable on Plaintiff's claim and in the letter of denial explained that the medical documentation in her file did not support a total disability as defined in the policy. (Lincoln/Till 001084–87.)

Before making its initial benefits determination, Lincoln had Nancy Bruemmer, a Senior Disability Nurse Consultant and Registered Nurse, review Plaintiff's MRI results and the records from Plaintiff's visits to Dr. Lurate. (Doc. # 37, at 8; Lincoln/Till 000016.) In her written review, Ms. Bruemmer discussed all of Dr. Lurate's records, notes, and opinions. She noted that there were no records of treatment from Dr. Voreis to support the level of pain and impairment that he indicated. Ms. Bruemmer's conclusion was that it was reasonable to allow

---

[12] Plaintiff saw Dr. Yearwood in December 2012 when Dr. Voreis was not available.

until January 22, 2013, for therapy and treatment. She determined that as of January 22, 2013, Plaintiff's symptoms had improved, that there was only one physical exam on file without sufficiently abnormal exam findings, no evidence of loss of strength, neuro, or motor findings, and that Plaintiff tolerated the three-hour drive to Dr. Lurate's office in Pensacola, so that there was not any support for restrictions beyond January 22, 2013. (Lincoln/Till 000016.)

The denial letter noted that the documentation in the claim file included the office and treatment notes from Andalusia Regional Hospital from November 2, 2012 through January 16, 2013; an undated attending physician statement from Dr. Voreis; office and treatment notes from Dr. Barry Lurate from December 18, 2012 to January 22, 2013; and an abilities form filled out by Dr. Voreis on March 4, 2013. The letter informed Plaintiff that Dr. Voreis's attending physician statement did not contain treatment notes or other medical documentation to support the level of impairment and pain that he noted on the statement. It also discussed the records from Dr. Lurate and noted that the physical exam performed at the December 18, 2012 visit did not show evidence of scoliosis or paraspinal muscle spasm, although x-rays of the lumbar spine showed multilevel disc disease in the lower and thoracic spine. The letter evaluated the visit to Dr. Lurate on January 16, 2013, noting that the records indicated that the dysesthesias she had reported at the previous visit had improved, that an MRI of the thoracic spine showed

20

spondylotic disease, and no physical examination findings were noted. (Lincoln/Till 001085.)

Regarding Plaintiff's occupation, the letter explained that the policy considers the main duties of her "occupation" and not her specific job and that the term "occupation" means "a collective description of a number of individual jobs that are performed, with variations, in many establishments," so that "there will be similarities between the main duties of [Plaintiff's] occupation and those of [her] job," and "[t]here may also be some differences."   (Lincoln/Till 001085.)   It indicated that Lincoln had considered Plaintiff's written job description, her employer's description of Plaintiff's job duties, and the description of her occupation from the Department of Labor's Dictionary of Occupation Titles ("DOT") to determine the material and substantial duties of Plaintiff's occupation. (Lincoln/Till 001086.)  Based on Lincoln's occupational assessment, it determined that the material and substantial duties of Plaintiff's occupation included:

- Operates radiologic, conventional, fluoroscopic, or portable equipment to produce radiographs (x-rays) of the body for diagnostic purposes
- Positions patient on examining table and adjusts immobilization devices to obtain optimum views of specified area of body requested by physician
- Moves x-ray equipment into specified position and adjusts equipment controls to set exposure factors, such as time and distance, based on knowledge of radiographic exposure techniques and protocols

(Lincoln/Till 001086.)   The letter stated that based on these material duties, Lincoln had determined that the medical evidence did not support a finding that Plaintiff was unable to perform the material and substantial duties of her regular occupation.

In summary, Lincoln's letter told Plaintiff that the medical documentation in the claim file did not support total disability as defined in the policy.  The letter stated that it appeared that she had an exacerbation of chronic mid and low back pain, but that the symptoms had improved by January 22, 2013, that there was only one physical examination included in the documentation, that the file lacked sufficiently abnormal examination findings and lacked documentation of a loss of strength, neurological deficits, or motor findings.  Based on these findings, Lincoln had determined that there was no support for a limitation after January 22, 2013,[13] "which would be reasonable to allow for therapy and treatment." (Lincoln/Till 001086–87.)

### b.    *First Appeal*

Plaintiff appealed Lincoln's denial of benefits on September 16, 2013. (Lincoln/Till 001073.)   The claim file on appeal included the entire file from the initial claim, as well as medical notes from Evergreen Primary Care, where

---

[13] Since Plaintiff's injury caused her to stop working on December 5, 2012, the elimination period ended on March 4, 2013, and for her to receive benefits under the policy, she had to "be restricted or limited from performing the main duties" of her occupation as of March 5, 2013.  (Lincoln/Till 001086.)  Plaintiff has never contested this date.

Plaintiff was seen on December 5 and December 10, 2012, and on January 7, 2013. Lincoln also referred Plaintiff's file for a peer review to Dr. Vicki Kalen, who is Board Certified in Orthopedic Surgery. (Lincoln/Till 001061–62.)

Dr. Kalen reviewed Plaintiff's claim file and determined that the clinical findings in the MRIs showed degenerative changes consistent with Plaintiff's age and weight, but without significant neural compression. In her report she stated that there were subjective complaints of pain without objective findings of impairment. She said that the spondylosis would restrict Plaintiff from lifting more than ten pounds frequently and twenty-five pounds occasionally and that Plaintiff should only bend at the waist occasionally. However, Dr. Kalen stated that there were no restrictions for sitting, standing, walking, crouching, crawling, kneeling, reaching, fingering, handling, or operating foot controls. (Lincoln/Till 001066–67.)

Dr. Kalen also reported that because the restrictions were based on Plaintiff's degenerative disease, they were effective from December 5, 2012, forward, and even if Plaintiff's symptoms improved, the restrictions would still be appropriate. She said that Dr. Voreis's statements that Plaintiff could not work and could never work again were not reasonable or consistent with medical findings. (Lincoln/Till 001067.) She noted that the March 4, 2013 abilities form completed

by Dr. Voreis did not include office visit notes with a history or examination. (Lincoln/Till 001066.)

Dr. Kalen reviewed Lincoln's requirements for a light duty occupation, which include lifting no more than twenty pounds occasionally and up to ten pounds frequently, standing or walking for six hours in an eight-hour day, possibly continuously sitting with the consistent use of either hand or foot controls, and carrying up to ten pounds. (Lincoln/Till 001066.) She also looked over Plaintiff's employer's job description, which indicated it was a heavy level job occasionally requiring lifting of up to 100 pounds. (Lincoln/Till 001065.) Dr. Kalen determined that Plaintiff could work at the light level as described by Lincoln because those requirements were within the restrictions she placed on Plaintiff, but also stated that Plaintiff could not work at the heavy level because she should not lift more than twenty-five pounds. (Lincoln/Till 001068.)

During the appeal process, Lincoln had Plaintiff's occupational assessment reviewed by Cathy McDonald, a vocational rehabilitation coordinator, to ensure that the correct "Own Occupation" had been selected. Ms. McDonald also evaluated Dr. Kalen's report and its impact on Plaintiff's ability to perform her own occupation. Ms. McDonald determined that the Radiologic Technologist occupation was appropriate and that it is a light duty occupation. The restrictions outlined in Dr. Kalen's report showed that Plaintiff had a medium lifting capacity

so that she was able to perform the main duties of her own occupation. (Lincoln/Till 000153.)

Lincoln upheld its initial denial of benefits after its review of Plaintiff's claim file and Dr. Kalen's report. The letter denying benefits explained that Lincoln determined Plaintiff's occupation based on information from her employer, the DOT, and an evaluation from vocational professionals. The main duties of her occupation were stated slightly differently from the first letter. They were defined as follows:

- Positions patient on examining table and adjusts immobilization devices to obtain optimum views of specified area of body requested by physician
- Explains procedures to patient to reduce anxieties and obtain patient cooperation
- Moves x-ray equipment into specified position and adjusts equipment controls to set exposure factors, such as time and distance, based on knowledge of radiographic exposure techniques and protocols
- Practices radiation protection techniques, using beam restrictive devices, patient shielding skills, and knowledge of applicable exposure factors, to minimize radiation to patient and staff

(Lincoln/Till 001060.) Lincoln explained that the physical capacity of a Radiologic Technologist in the national workforce is a light physical capacity occupation so that it includes occasionally lifting no more than twenty pounds, frequently lifting up to ten pounds, and typically requires standing and walking for six hours out of an eight-hour day. (Lincoln/Till 001060.) The summary of appeal noted that the entire file was reviewed for the appeal, and it summarized the

medical documentation in the file. Lincoln noted that when Dr. Lurate saw Plaintiff on January 22, 2013, her right leg dysesthesias had improved, although it was not gone. It also stated that Dr. Voreis had restricted Plaintiff to occasionally lifting and carrying up to twenty pounds and occasionally sitting, standing, walking, driving, fingering, handling, and working foot controls. He also stated that she could never kneel. However, the letter also noted that there were no office visit notes from Dr. Voreis providing a history or examination to support the restrictions.

Lincoln based its decision on the report from Dr. Kalen and its review of the file. It also noted that "[t]he sole occupational opinions, from Dr. DiVoreis [sic], are unsupported by clinical findings." (Lincoln/Till 001062.) It found that the medical documentation did not support a finding that Plaintiff could not perform the main duties of her own occupation as defined by the policy.

### c.    *Second Appeal*

On November 11, 2013, Plaintiff appealed the denial of benefits a second time. (Lincoln/Till 000918.) For the second appeal, Plaintiff provided additional medical records, including her physical therapy records, and the Social Security determination that she is totally disabled. (Doc. # 40, at 12.) During the review for the second appeal, Lincoln sent the claim file to Dr. Heidi Klingbeil, who is board certified in physical medicine and rehabilitation and board certified in pain

medicine, for review by a second independent physician. (Doc. # 37, at 10; Lincoln/Till 000667.) The medical documentation provided to Dr. Klingbeil included the Social Security medical evaluation by Dr. Johnson and the Social Security examination by Dr. Voreis. (Lincoln/Till 000663, 000665.) Dr. Klingbeil first noted that she had thoroughly reviewed all of the received documentation and then briefly summarized some of the medical records. Dr. Klingbeil completed her review on May 29, 2014. She noted that the last physical exam performed on Plaintiff was in 2013 because Plaintiff had declined the physical exam attempted by Dr. Johnson. (Lincoln/Till 000663–65.) Dr. Klingbeil concluded that Plaintiff's current physical exam findings were unknown, and based on this lack of an updated physical exam, the medical documentation did not support any current restrictions. (Lincoln/Till 000665.) She stated that "[t]he attending physician's restrictions are not supported as reasonable or necessary for this claimant, as there are no updated physical exam findings demonstrating objective evidence of functional impairment that correlates with recent imaging that would support medically appropriate restrictions." (Lincoln/Till 000666.)

On July 9, 2014, Lincoln sent Plaintiff a letter denying benefits after its second review of her file. (Lincoln/Till 000075.) It stated that during the review, the entire claim file and all the additional documentation that she had submitted were used to make the determination. The letter reiterated the vocational summary

of Plaintiff's occupation, which it said was based upon the information from her employer, the DOT, and an evaluation from vocational professionals.   The summary determined that Plaintiff's occupation as a Radiologic Technologist in the national workforce is a light physical capacity occupation, which is defined as lifting no more than twenty pounds occasionally and up to ten pounds frequently and requiring standing or walking for six out of eight hours in a day.  (Lincoln/Till 000076–77.)  The letter summarized the report from Dr. Klingbeil and noted that the report had been sent to Plaintiff's counsel on June 3, 2014, to allow Plaintiff time to send a copy to her treating physicians to review it and provide additional information.  It also stated that it had received a copy of Plaintiff's favorable Social Security determination on July 7, 2014, but no new medical information. (Lincoln/Till 000078–79.)

In the decision portion of the letter, Lincoln recognized that Plaintiff had several medical diagnoses, including chronic thoracic and lumbar pain, abdominal pain, hyperlipidemia, esophageal reflux, fatigue, obesity, and depression. However, Lincoln determined, after reviewing the medical documentation and consulting Dr. Klingbeil's report, that the documentation did not support a finding that Plaintiff was unable to perform the main duties of her occupation through the elimination period.  Lincoln noted that the records did not indicate motor sensory deficits, loss of coordination or range of motion, loss of strength, or other specific

deficits; it also stated that the record did not show functional impairment or a need for restrictions or limitations. (Lincoln/Till 000079.) Lincoln acknowledged that Plaintiff was receiving Social Security benefits, but informed Plaintiff that its policy and review provisions were independent of Social Security processes, plan provisions, and independent information received by the Social Security Administration. (Lincoln/Till 000079.)

**E.   Lincoln's Policies and Procedures**

Lincoln maintains its disability claims and appeals unit as separate and independent entities from its financial and underwriting departments. The employees in the disability claims department and appeals unit are paid fixed annual salaries and are not compensated based on the outcome of their claims. (Doc. # 57-2, at 1.) These employees are eligible for annual bonuses, which are based on the overall financial performance of Lincoln and its related entities in all areas of its business and an individual employee's performance. (Doc. # 57-2, at 2; Doc. # 57-3, at 64.) Evaluations of the employees who handled Plaintiff's claim demonstrate that several areas of competency are considered, including customer experience, operational execution, quality/risk management, and professional development. (*See* Doc. # 57-1.) The operational execution portion of the evaluation includes a discussion of an employee's inventory management,

percentage of claims that are pending, and number of decisions made.  (Doc. # 57-1, at Lincoln/Till 001500.)

Lincoln's policies include a method for evaluating a Social Security award. The policy indicates that, if Lincoln determines that a benefits claim will be denied even when a Social Security decision is favorable, that the letter should explain the differences in the decision.  (Lincoln/Till 001694–95.)  Lincoln's procedures also give its employees examples of how to distinguish the two decisions.

## IV.  DISCUSSION

### A.   Disabled as a Matter of Law

Plaintiff asserts that she is disabled as a matter of law and therefore should be awarded long term disability benefits under the plan.  (Doc. # 40, at 14.)  She insists that all of the evidence before the court supports that she is disabled.  She also argues that, while Lincoln is not legally bound by the Social Security determination, its vocational analysis is "far more comprehensive than that undertaken by Lincoln" so that it "stands alone and is uncontested."  (Doc. # 40, at 15.)  She asserts that Lincoln disregarded her complaints of pain, and that the subjective nature of pain is not grounds for denial of benefits.  Lincoln responds by asserting that the administrative record does not demonstrate that Plaintiff is disabled under the terms of the plan and cites Plaintiff's medical records that support its finding that Plaintiff is not disabled.

Plaintiff does not cite, nor has the court discovered, any legal authority that supports her argument that she is disabled as a matter of law.  This argument by itself with no evidentiary support has no merit.  Nor is a favorable Social Security decision dispositive of disability under an ERISA plan.  *See Oliver v. Aetna Life Ins. Co.*, 613 F. App'x 892, 897 (11th Cir. 2015) (citing *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1314 n.8 (11th Cir. 1999)).  In order to show that she is entitled to benefits under the ERISA plan, Plaintiff must show that Lincoln's decision was *de novo* wrong and arbitrary and capricious.  *See Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).  The court turns to the issues of whether Plaintiff received a full and fair review and whether Lincoln's decision was arbitrary and capricious.

## B.   <u>Full and Fair Review</u>

Plaintiff asserts that Lincoln did not provide her a full and fair review of its denial of benefits as required by ERISA.  (Doc. # 40, at 16.)  She insists that Lincoln committed multiple procedural violations, including (1) allowing its conflict of interest to taint the claim process, (2) disregarding her submission of supporting evidence for her administrative appeal, (3) failing to provide her with all relevant documents, (4) disregarding the Social Security determination and vocational analysis, and (5) disregarding the actual requirements of her job description.  (Doc. # 40, at 15–27; Doc. # 56-1, at 19.)  She argues that these

procedural violations are so egregious, that rather than remand with instructions to provide a full and fair review, she is entitled to a judgment requiring Lincoln to pay her long term disability benefits.  (*See* Doc. # 40, at 15–16, 34.)

Pursuant to 29 U.S.C. § 1133, an administrator is required to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review . . . of the decision denying the claim."  29 U.S.C. § 1133(2); *accord Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1245 (11th Cir. 2008).  "The administrator must '[p]rovide . . . upon request . . . all documents, records, and other information relevant to the claimant's claim for benefits' to qualify as a 'full and fair review.'"  *Glazer*, 524 F.3d at 1245 (quoting 29 C.F.R. § 2560.53–1(h)(2)(iii)).  In order for a review process to be deemed a "full and fair review," the procedures must "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."  29 C.F.R. § 2560.53–1(h)(2)(iv); *accord Glazer*, 524 F.3d at 1245.  An administrator must have substantial support to deny benefits and must promptly notify a plan participant,

> in writing and in language likely to be understood by laymen, that the claim has been denied with the specific reasons therefor.  The [administrator] must also inform the participant of what evidence he relied upon and provide him with an opportunity to examine that evidence and to submit written comments or rebuttal documentary evidence.

*Grossmuller v. Int'l Union, United Auto. Aerospace & Agricultural Implement Workers of Am.*, 715 F.2d 853, 857–58 (3d Cir. 1983).

The Eleventh Circuit has found procedural unfairness when an administrator failed to obtain and consider a Social Security disability award. *Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 675–76 (11th Cir. 2014) (determining that, "having sent [the plaintiff] to seek alternative compensation, [the defendant] was not free to ignore the evidence generated by the SSA process as soon as it no longer had a financial stake in the amount of money the SSA decided to award"). Other courts have found ERISA procedural violations based on a deficient letter denying benefits or upholding a denial of benefits. *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir. 1993) (determining that ERISA procedural guidelines were violated because the defendant had not provided the plaintiff with a specific reason for the denial of benefits); *Grossmuller*, 715 F.2d at 858 (affirming district court's finding that the plaintiff did not receive a full and fair review because the letter informing him that his benefits were being terminated did not specify the evidence used to support the determination or allow the plaintiff an opportunity to respond to or rebut the evidence); *Olds v. Retirement Plan of Int'l Paper Co.*, 782 F. Supp. 2d 1297, 1302 (S.D. Ala. 2001) (finding that the plaintiff was denied a full and fair review because the defendant upheld a denial of benefits

33

without taking into account comments and records that confirmed the existence of the condition upon which the plaintiff's claim was based).

When a court determines that an administrator has violated ERISA procedures, the usual remedy is to remand the case for a full and fair review. *Id.* at 1303 (quoting *Weaver*, 990 F.2d at 159). The one exception to a remand is when "the record establishes that the plan administrator's denial of the claim was an abuse of discretion as a matter of law." *Id.* (quoting *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 240 (4th Cir. 2008)). For this exception to apply, "the case [must be] so clear cut that it would be unreasonable for the plan administrator to deny benefits on any ground." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1289 (10th Cir. 2002) (internal citation and quotation marks omitted).

### 1.   *Lincoln's Conflict of Interest*

Plaintiff's first ground for asserting that she was denied a full and fair review is that Lincoln allowed its conflict of interest to taint the review process. (Doc. # 40, at 17–18.) Lincoln does not deny that there is a structural conflict of interest but asserts that it takes "active steps to reduce potential bias" so that any conflict from its dual role of both administering and funding benefits, is *de minimis*. (Doc. # 58, at 21.)

In her motion for summary judgment, Plaintiff makes conclusory statements about "cherry-picking" and Lincoln's procedural abuses during the review process. (Doc. # 40, at 18.)   However, she does not provide evidence to support these accusations.  She does not mention the conflict of interest in her reply to Lincoln's response to her motion for summary judgment.  (*See* Doc. # 64-1.)  In her response to Lincoln's summary judgment motion, she alleges that the evidence demonstrates that Lincoln's claims and appeals employees were not insulated from Lincoln's profit interests.  (Doc. # 56-1, at 22–23.)  Lincoln maintains that Plaintiff has taken quotes from employee evaluations out of context in order to create an illusion of improper impact of the structural conflict.  (Doc. # 62-1, at 13.)  It insists that when the performance evaluations are read in their entirety and in context, the comments do not indicate that the decision was tainted by the conflict of interest.

The Supreme Court has held "that for ERISA purposes a conflict exists" when an insurance company "both evaluates claims for benefits and pays benefits claims."  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112–115 (2008).  The Eleventh Circuit has applied *Glenn* to its six-step analysis.[14]  When a conflict of interest is present, the sixth step is modified and the "conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious."  *Blankenship*, 644 F.3d

---

[14] The six-step analysis is discussed in part C of the Discussion.

at 1354–55.   The effect of a structural conflict of interest does not need to be considered until the sixth step of the analysis.   *See Blair v. Metro. Life Ins. Co.*, 955 F. Supp. 2d 1229, 1254 n.16 (N.D. Ala. 2013).   Plaintiff does not provide, nor has the court been able to discover, precedent that holds that a decision influenced by a conflict of interest is a denial of a full and fair review so that a claimant should be granted benefits.   Plaintiff has not shown that she was denied a full and fair review based upon Lincoln's conflict of interest.   The analysis of the conflict of interest is in the court's discussion of the last step of the six-step analysis (part IV.C.4.).

## 2.   *Lincoln's Alleged Disregard of Plaintiff's Submission of Evidence*

Plaintiff's second ground for asserting that she was denied a full and fair review is that Lincoln disregarded her submission of evidence supporting her claim.   (Doc. # 40, at 18.)   She insists that Lincoln ignored many "physical exam findings . . . including the many MRI studies and radiological reports and physician and physical therapy records."   (Doc. # 40, at 19; *see* Doc. # 64-1, at 4–5.)   The only evidence Plaintiff cites to support this assertion is her attorney's letter to Lincoln, which contains unsupported conclusory allegations about the review process.   In the letter, counsel accuses Lincoln of writing Dr. Klingbeil's report for her, but the only basis for the allegation is that the report does not support his client's claim for disability benefits.   (Doc. # 40, at 20; Lincoln/Till 000364.)

Plaintiff also claims that Lincoln refused to credit any of her medical records that were dated prior to December 4, 2012, and takes issue with the fact that these records were not requested by Lincoln on the initial review and were only included in the claim file when her counsel undertook to collect and send them to Lincoln. (Doc. # 64-1, at 2.)  She insists that "[n]ot a single piece of evidence outside these dates was discussed."  (Doc. # 64-1, at 3.)

Lincoln counters Plaintiff's assertion by citing evidence in the administrative record where it stated that it had reviewed all of the information in her file including any newly submitted evidence.  (Doc. # 58, at 17.)  Lincoln also asserts that each of the reviewing physicians considered all of the documentation in the claim file.  (Doc. # 58, at 17.)

An administrator conducting a "full and fair review" must take into account any and all documentation, comments, and information provided, whether or not the information was available during the initial claims decision. 29 C.F.R. § 2560.53–1(h)(2)(iv); *accord Glazer*, 524 F.3d at 1245.

In Lincoln's initial letter denying benefits, and in both of the letters denying benefits after the appeals, Lincoln stated that it had reviewed the entire claim file and all evidence, including any newly submitted evidence.  (Lincoln/Till 000075, 001059, 001084.)   In Lincoln's letter denying benefits after Plaintiff's second appeal, Lincoln stated that "[Plaintiff] is also being treated for abdominal pain,

hyperlipidemia, esophageal reflux, fatigue, obesity, and depression but the records

. . . do not show any significant abnormalities or impairment due to these

conditions." (Lincoln/Till 000079.)  A review of the administrative record reveals

that most of these conditions are noted in medical records that pre-date

December 4, 2012. (*See e.g.*, Lincoln/Till 000757 (office note dated October 26,

2012 that indicates fibromyalgia); 000763 (office note dated July 6, 2011 that

indicates depression); 000764 (office note dated November 18, 2009 indicating

hyperlipidemia); 000765 (office note dated November 20, 2007 indicating

hyperlipidemia and fatigue); 000766 (office note dated October 23, 2007 indicating

hyperlipidemia and esophageal reflux); 000767 (office note dated October 29,

2008 indicating abdominal pain and hyperlipidemia).)

Dr. Kalen's report from the first appeal discusses each of the records that the

file indicates she received.  (*See* Lincoln/Till 001065–69.)  Plaintiff does not allege

that Lincoln withheld any available medical documentation from Dr. Kalen when

she reviewed Plaintiff's file.  Dr. Klingbeil's report from the second review states

that all of the "records provided were thoroughly reviewed."  (Lincoln/Till

000663.)  After listing the records that had been provided, Dr. Klingbeil briefly

summarizes the records.[15]  (Lincoln/Till 000664–65.)  Plaintiff does not allege and

---

[15] Despite Plaintiff's contention that Lincoln ignored all records dated before December 4, 2012, her counsel's letter took issue with the fact that many of the records summarized in Dr. Klingbeil's report did not involve Plaintiff's back condition.  (Lincoln/Till000364.)   However, Plaintiff's counsel is the one who collected and submitted these records to Lincoln for review.

the court has not discovered that Lincoln withheld any available medical documentation from Dr. Klingbeil when she reviewed Plaintiff's file.

Plaintiff has not demonstrated that Lincoln failed to review any of her submitted medical evidence during the pendency of her claim and appeals. Under the terms of the plan, Plaintiff bore the burden to prove that she was disabled. (Lincoln/Till 000047.) Therefore, Plaintiff was not denied a full and fair review based on the fact that Plaintiff's counsel collected and provided some of the medical documentation for the second appeal or that the documentation was not collected by Lincoln for the initial claim or first appeal. Plaintiff has not shown that Lincoln disregarded her submission of medical documentation.

### 3.   *Lincoln's Alleged Failure to Provide All Relevant Documents*

Plaintiff's third ground for asserting that she was denied a full and fair review is that Lincoln violated ERISA procedural tenets by not providing her with all relevant documents. Plaintiff insists that because Dr. Klingbeil's report was noted in the claim file to be a "final report" that there must have been several drafts that were not provided to her. (*See* Doc. # 40, at 20–21; Doc. # 41, Ex. 28.) She

---

(Doc. # 64-1, at 2.) As already discussed, Lincoln is required to review all of the documents in the file in order to provide a full and fair review.

The fact that Dr. Klingbeil took the time to summarize all of the records and not just those concerning Plaintiff's back condition constitutes additional evidence that she reviewed the entire file and did not ignore any of the evidence submitted by Plaintiff. Plaintiff's assertion that the summaries imply that Dr. Klingbeil ignored more probative evidence is unfounded. Dr. Klingbeil provided more detailed summaries of the MRIs, x-rays, and office visit notes related to Plaintiff's back conditions than to those that are unrelated.

argues that she was also denied a "meaningful opportunity" to respond to Dr. Klingbeil's report and provide rebuttal evidence and that "[s]imply asking for commentary on that review" was not enough for a full and fair review process. (Doc. # 40, at 24–25.)   Other than these drafts of the report, Plaintiff does not identify which documents Lincoln failed to provide.   In her response to Lincoln's summary judgment motion, she insists that Lincoln has still not complied with discovery and states that she would be filing a motion to enforce in order to get the necessary information from Lincoln.   (Doc. # 56-1, at 22.)   Lincoln insists that it has complied with discovery and that Plaintiff "failed to identify how [its] response was deficient."   Lincoln states that its counsel sent two letters to Plaintiff's counsel inquiring about the assertion and never received an explanation.   (Doc. # 62-1, at 16 n.7.)   Plaintiff never filed the motion to enforce.

An administrator is required to provide "'all documents, records, and other information relevant to the claimant's claim for benefits' for the review to qualify as a 'full and fair review.'"   *Glazer*, 524 F.3d at 1245 (quoting 29 C.F.R. § 2560.503–1(h)(2)(iii)).   However, the Eleventh Circuit has held that an administrator is not required to provide a claimant with a copy of a report by an independent appeal-level reviewing physician until after the administrator has made its decision on the appeal.   *Id.*   An administrator has not "relied upon" such a

report until the benefit determination has been made; therefore, the report does not have to be produced to the claimant until after the final decision. *Id.*

The only documents that Plaintiff alleged that she did not received are early drafts of Dr. Klingbeil's report. There is no affirmative representation that such drafts exist. Lincoln asserts that it has responded to discovery as ordered by the court. Plaintiff did not respond to Lincoln's counsel's attempt to clarify what discovery was sought and did not file the motion to enforce. The court concludes, therefore, that all discovery issues are resolved and that the record is complete.

Dr. Klingbeil reviewed Plaintiff's file on the second appeal; therefore, Lincoln did not rely on the report until it made its determination during the second appeal. Thus, Lincoln was not required to provide Plaintiff with a copy of the report until after it made its determination on the second appeal. Lincoln provided Plaintiff with a copy of the report prior to its determination and allowed her time to forward it to her treating physicians for review. In the letter accompanying the report, Lincoln stated that "If your client's physicians should disagree with the assessment then we would appreciate any information that he/she could provide to us that would dispute the enclosed findings." (Lincoln/Till 000661.) Plaintiff was given twenty-one days to complete this process but did not submit additional evidence or a rebuttal to the findings.

Based on the Eleventh Circuit's holding in *Glazer*, the court finds that Lincoln provided Plaintiff with Dr. Klingbeil's report before it was required to do so under ERISA procedures. *See Glazer*, 524 F.3d at 1245. Lincoln also allowed Plaintiff adequate time to review and provide rebuttal information to the report. Therefore, Plaintiff has not shown that Lincoln denied her a full and fair review by failing to provide all relevant documents to her or by not allowing her a proper opportunity to respond to Dr. Klingbeil's report.

**4.    *Lincoln's Alleged Disregard of the Social Security Determination and Vocational Analysis***

Plaintiff's fourth ground for asserting that she was denied a full and fair review is that Lincoln disregarded the Social Security determination and vocational analysis. (Doc. # 40, at 25–26.) Plaintiff does not provide evidentiary support for her conclusory assertion that Lincoln disregarded the Social Security determination and vocational analysis. Instead, she relies on the Eleventh Circuit decision in *Melech* and insists that Lincoln committed a violation similar to the procedural violation in that case. (Doc. # 56-1, at 20 n.8 (citing *Melech*, 739 F.3d 663).) She also quotes Lincoln's policies requiring the appeal letter to make a distinction between the Social Security decision and its decision, and states that Lincoln violated its own policies by not addressing this distinction in the denial letter. (Doc. # 40, at 7–8.) Lincoln contends that it did review the Social Security

determination and that Dr. Klingbeil also reviewed the medical evaluation by Dr. Johnson for the Social Security claim. (Doc. # 58, at 15.)

In *Melech*, the Eleventh Circuit determined that it was procedurally unfair for a plan administrator to participate in a claimant's Social Security application when the administrator granted the applicant's benefits claim and therefore would benefit from the Social Security award, but to ignore the Social Security determination when the administrator denied benefits. 739 F.3d at 675–76. In a recent unpublished decision, the Eleventh Circuit distinguished the *Melech* situation and held that an administrator is not "required to specifically consider either the Social Security award itself or the contents of the Notice of Award letter" once it has already considered the Social Security doctor's report. *Oates v. Walgreen Co.*, 573 F. App'x 897, 911 (11th Cir. 2014). The Eleventh Circuit found these circumstances "very different from *Melech*, in which the plan administrator deemed irrelevant the SSA award and the evidence on which it was based." *Id.* In *Melech*, no part of the Social Security award or file was available to or reviewed by the administrator during the pendency of the claim. 739 F.3d at 670.

The procedural violation that the Eleventh Circuit found in *Melech* is different from the situation here. Similar to the situation in *Oates*, where a reviewing physician considered the Social Security medical evaluation, here Dr.

Klingbeil reviewed Dr. Johnson's Social Security medical evaluation of Plaintiff and Dr. Voreis's assessment, both of which supported Plaintiff's Social Security claim.  (*See Oates*, 573 F. App'x at 902; Lincoln/Till 000665.)   Additionally, Lincoln stated in its letter denying benefits after Plaintiff's second appeal that it had reviewed all of the documentation in the file.  (Lincoln/Till 000077.)  This documentation included Dr. Johnson's evaluation, Dr. Voreis's long term disability assessment for Social Security, the Social Security determination, and the vocational analysis.  Lincoln mentioned Dr. Johnson's evaluation and the Social Security benefits in the denial letter following the second appeal.  Lincoln also explained that the Social Security benefits decision is based on a different plan and interpretation than the ERISA plan.  (Lincoln/Till 000079.)

This language explains the difference between the Social Security grant of benefits and Lincoln's denial.  Lincoln's internal policies and procedures identify specific Social Security provisions that do not apply to this ERISA plan, but those provisions are not the only differences between the procedures in this case and the Social Security procedures.  *See Oliver*, 613 F. App'x at 897–99 (discussing the Social Security five-step procedure and contrasting it with provisions in an ERISA plan; determining that "based on our precedent and the manifestly different criteria of the SSA and the Plan, [the claimant] cannot simply rely on the determination by the SSA in challenging [the] denial of benefits").  Therefore, there is no evidence

44

that Lincoln violated its procedures by not mentioning one of the listed Social Security distinction criteria, because those differences were not present here.  It followed its procedures by explaining that its denial is based on the plan provisions that are independent and different from the Social Security provisions.

Plaintiff offers no proof that Lincoln disregarded or ignored the Social Security determination or medical evaluation.  The administrative record demonstrates that Lincoln reviewed the Social Security determination and the evidence upon which it was based.  Plaintiff has not shown that she was denied a full and fair review by Lincoln's alleged disregard of the Social Security determination and the vocational analysis.

**5.   _Lincoln's Alleged Disregard of Plaintiff's Actual Job Requirements_**

Plaintiff's fifth and final ground for asserting that she was denied a full and fair review is that Lincoln disregarded her actual job requirements.  (Doc. # 40, at 27–29.)  She insists that Lincoln ignored the actual description of her job, as provided by Gilliard, and relied solely on the description provided in the DOT.  She also asserts that Lincoln ignored its own internal policies and procedures by "ignoring" her actual job description because its policies require its personnel to "examine" her job description and the "physical requirements of her job."  (Doc. # 56-1, at 20–21.) Finally, she argues that the DOT job classifications are outdated, having been produced in 1991, and having been recently replaced by a

new online classification system.  (Doc. # 40, at 27–28.)  However, Plaintiff did not submit evidence to demonstrate how this new classification system would have changed the national workforce definition of her occupation.  Lincoln asserts that Plaintiff's argument ignores the plan provisions and definitions.  (Doc. # 58, at 7.) It also insists that it reviewed the entire file, including Plaintiff's job description. (Doc. # 62-1, at 4.)

Similar to Plaintiff's other arguments about Lincoln ignoring or disregarding portions of the record, Plaintiff does not provide proof that Lincoln "ignored" or "disregarded" her actual job description.  On the contrary, the administrative record shows that Lincoln reviewed Plaintiff's actual job description several times.

In each of the three determination letters, Lincoln states that it reviewed the entire claim file.  (Lincoln/Till 000075, 001059, 001084.)  Lincoln requested the job description during the initial claim process.  (Lincoln/Till 001116.) Additionally, each letter described the main duties of Plaintiff's occupation as determined by Lincoln, and noted that the determination was based on the information from Plaintiff's employer and the information from the DOT. (Lincoln/Till 000076, 001060, 001086.)  During the review on the first appeal, Lincoln had a vocational analysis performed to determine that it had correctly determined Plaintiff's "own occupation" and the appropriate physical capacity required.  (Lincoln/Till 000153.)  This analysis included reviewing the formal job

description provided by her employer.   Dr. Kalen also considered the job description in her review and evaluated Plaintiff's ability to work under both her actual job description and the national workforce standard used by Lincoln. (Lincoln/Till 001068.)

Plaintiff has not demonstrated that Lincoln disregarded her actual job description during its initial claim review or during the two appeals.   Nor has Plaintiff produced binding authority that requires Lincoln to deviate from its "own occupation" definition set out clearly in the policy.   Plaintiff did not demonstrate how the new online system used by the Department of Labor would have changed her "own occupation" in the national workforce.   Therefore, Plaintiff has not shown that she was denied a full and fair review by Lincoln's alleged disregard of her actual job description.   The definition Lincoln used for Plaintiff's own occupation is compared with Plaintiff's job description during the six-step analysis in Part IV.B.3.a.

Because Plaintiff has not shown that she was denied a full and fair review of her claim, the court now turns to whether Lincoln's benefits determination was correct and reasonable under the appropriate standard of review for a denial of benefits under ERISA.

C.   **Six-Step Analysis**

1.   ***Standard of Review***

ERISA does not establish the standard a court uses to review an administrative decision denying benefits under 29 U.S.C. § 1132(a)(1)(B); however, the Supreme Court has recognized that there are three possible standards: *de novo*, arbitrary and capricious, and heightened arbitrary and capricious.  *See Glenn*, 554 U.S. at 110–11 (citing *Firestone Tire and Rubber Co. v. Bruch*, 498 U.S. 101 (1989)); *but see Doyle v. Liberty Life Assurance Co. of Bos.*, 542 F.3d 1352, 1359 (11th Cir. 2008) ("*Glenn* implicitly overrules and conflicts with our precedent requiring courts to review under the heightened standard a conflicted administrator's benefits decision").  As the Supreme Court described, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 498 U.S. at 115.  The *de novo* standard "offers the highest scrutiny (and thus the least judicial deference) to the administrator's decision."  *Williams v. Bellsouth Telecomms., Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004).

The arbitrary and capricious standard applies if the plan gives an administrator discretionary authority.  *Doyle*, 542 F.3d at 1359–60.  In other words, this standard applies when "the plan documents at issue explicitly grant the claims

administrator discretion to determine eligibility or construe terms of the plan." *HCA Health Servs. of Ga., Inc. v. Emp'rs Health Ins. Co.*, 240 F.3d 982, 992 (11th Cir. 2001).   This standard accords the most judicial deference–and the least scrutiny–to the administrator's decision.  *Williams*, 373 F.3d at 1137.

The Eleventh Circuit has adopted a six-step framework for reviewing ERISA benefits decisions.  *Blankenship*, 644 F.3d at 1354.  The framework was first established in *Williams* and modified in *Doyle* based on the Supreme Court's decision in *Glenn*.  *Id.* at 1354–55 (citing *Williams*, 373 F.3d at 1137–38; *Doyle*, 542 F.3d at 1359–60).  The present six-step test is as follows:

> (1)   Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2)  If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end the inquiry and reverse the decision.
>
> (3)  If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4)  If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5)   If there is no conflict, then end the inquiry and affirm the decision.

(6)  If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355 (citing *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010)).[16]  The arbitrary and capricious standard of review applies to "both the administrator's construction of the plan and concomitant factual findings." *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1451 (11th Cir. 1997).

## 2. *Discretionary Authority and De Novo Review*

The plan states that Lincoln has the discretionary authority to "1. establish administrative procedures, determine eligibility and resolve claims questions; 2. determine what information the Company reasonably requires to make such decisions; and 3. resolve all matters when an internal claim review is requested." (Lincoln/Till 000049.)  Plaintiff does not contest Lincoln's discretionary authority under the plan.  (*See* Docs. # 40, 56-1, 64-1.)  Because of the clear grant of discretionary authority under the plan, the court will review Lincoln's decision for reasonableness without reviewing the decision *de novo*.[17]  *See Holland v. Int'l*

_____

[16] The phrases "arbitrary and capricious" and "abuse of discretion" are interchangeable in an ERISA case.  *Blankenship*, 644 F.3d at 1355 n.5 (citing *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989)).

[17] Although the court declines to review the decision *de novo*, the evidence in this case supports a finding that Lincoln's decision is wrong.  Lincoln failed to credit the statements of the three treating physicians who saw Plaintiff in person and all conflicting evidence was decided against Plaintiff.  Lincoln failed to credit any evidence supporting Plaintiff's subjective complaints of pain or loss of strength.  Lincoln repeatedly noted that Plaintiff did not submit evidence of a physical exam, but chose not obtain an independent medical examination by a physician of its choice.  Because the plan grants Lincoln discretion, it was not required to take

*Paper Co. Retirement Plan*, 576 F.3d 240, 246 (5th Cir. 2009) (noting that when a plan clearly gives an administrator discretionary authority to determine benefits, the appropriate standard of review is abuse of discretion).

### 3.       *Arbitrary and Capricious Review*

When reviewing a benefits determination under the arbitrary and capricious standard, the court is limited to the record before the administrator at the time it made the decision. *Blankenship*, 644 F.3d at 1354 (citing *Jett*, 890 F.2d at 1140); *see e.g. Buckley v. Metro. Life*, 115 F.3d 936, 941 (11th Cir. 1997). Under this standard, the administrator's interpretation of the plan is entitled to a high level of deference; however, the standard is not toothless. "[A] deferential standard of review does not mean that the plan administrator will prevail on the merits. It means only that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (quoting *Firestone*, 489 U.S. at 111). If "no reasonable basis exists for the decision," then the decision is arbitrary and capricious. *Braden v. Aetna Life Ins. Co.*, 597 F. App'x 562, 565 (11th Cir. 2014) (quoting *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997) (internal quotation marks omitted)).

---

any of these actions, however, when the court considers the combination of these factors it "disagrees with the administrator's decision." *See Capone*, 592 F.3d at 1196 (noting that "[a] decision is 'wrong' if, after a *de novo* review, 'the court disagrees with the administrator's decision.'") (citing *Williams*, 373 F.3d at 1138).

The "decision to deny benefits must be upheld so long as there is a 'reasonable basis' for the decision." *Oliver*, 497 F.3d at 1195 (citing *Jett*, 890 F.2d at 1140). "It is irrelevant that the court or anyone else might reach a different conclusion." *Turner*, 291 F.3d at 1274. The administrator's decision "need not be the best possible decision, only one with a rational justification." *Griffis*, 723 F.2d at 825. A denial of benefits based on conflicting, reliable evidence is not arbitrary and capricious. *See Oates*, 573 F. App'x at 910 (citing *Oliver*, 497 F.3d at 1199). When an administrator has discretion to determine the proof required for a finding of disability, it is not unreasonable for the administrator to require objective evidence. *See Wangenstein v. Equifax, Inc.*, 191 F. App'x 905, 913–14 (11th Cir. 2014).

Plaintiff asserts that Lincoln's decision was arbitrary and capricious because (1) it ignored the actual requirements of Plaintiff's job description, (2) it disregarded the Social Security award and vocational assessment, (3) it favored the opinions of "paper-reviewing doctors" over physicians who treated Plaintiff in person, and (4) it ignored the many "physical exam findings" in the ERISA record.[18] (Doc. # 40, at 15–29.)

---

[18] Plaintiff also asserts that the decision was not reasonable because she was denied a full and fair review and because Lincoln allowed its conflict of interest to influence the decision. In the previous section, the court determined that Plaintiff has not shown that she was denied a full and fair review. Lincoln's conflict of interest will be discussed in the sixth step of the analysis (part IV.C.4.).

### a.    Definition of Own Occupation

Plaintiff contends that Lincoln ignored Gilliard's description of her occupation in violation of its own procedures and ERISA.  She accuses Lincoln of "elect[ing] to rely exclusively" on the DOT definition.  (Doc. # 40, at 27.)  She insists that courts "routinely require consideration of actual job responsibilities and requirements."   Plaintiff relies on *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 385–86 (3d Cir. 2003), to support her proposition that Gilliard's description of her actual job responsibilities should be the only relevant description of her "own occupation" under the plan.  (Doc. # 40, at 28.)  Lincoln asserts that its determination that Plaintiff's occupation was a light-duty occupation is correct and reasonable under the terms of the policy.  (Doc. # 58, at 7.)  The court agrees with Lincoln.

Plaintiff's arguments fail for two reasons.  First, her reliance on *Lasser* is misplaced.  In *Lasser*, because the policy did not define "regular occupation" the court applied the "plain meaning of 'regular occupation'" and rejected the administrator's "generic understanding" of the term.   344 F.3d at 385–86.

Unlike the policy in *Lasser*, the policy here defines the term "Regular Occupation or Own Occupation" as "includ[ing] the main duties of that occupation as performed in the national workforce; **not** as performed for a certain firm or at a certain work site." (Lincoln/Till 000045.)  Lincoln included this definition in each

of its letters to Plaintiff denying her benefits after her two appeals.  (Lincoln/Till 000075, 001059.)  In Lincoln's letter denying Plaintiff's initial claim, it explained:

> It is important to note that the policy under which you are covered refers to and is governed by the main duties of your regular 'occupation' and not by the duties of your specific job.  Nearly every job in the economy is performed slightly different from one employer to another. . . . The term 'occupation' refers to a collective description of a number of individual jobs that are performed, with variations, in many establishments.  Consequently, there will be similarities between the main duties of your occupation and those of your job.  There may also be some differences.

(Lincoln/Till 001085.)   Under the terms of the policy, Plaintiff's "regular occupation" is defined not by her actual job duties and requirements, but by reference to the main duties of her occupation as defined in the national workforce.  This definition was provided in the policy, reasonably relied upon by Lincoln in making its benefits determination, and explained to Plaintiff when the benefits were denied.  Plaintiff has not presented an alternate definition of her occupation based on the national workforce standard defined in the policy.

The second reason Plaintiff's arguments fail is she has not provided evidence that Lincoln disregarded her actual job requirements.  As explained in the full and fair review analysis, Part IV.B.5., the administrative record demonstrates that Lincoln considered Gilliard's description of Plaintiff's actual job requirements when it determined the main duties of her regular occupation.  In addition, a review of the main duties as defined by Gilliard and as defined by Lincoln

demonstrates that there are few differences.  However, the main difference is a significant one.

After reviewing all the relevant information, including Gilliard's description, a vocational analysis, and the DOT, Lincoln defined the main duties of Plaintiff's occupation as

- Positions patient on examining table and adjusts immobilization devices to obtain optimum views of specified area of body requested by physician
- Explains procedures to patient to reduce anxieties and obtain patient cooperation
- Moves x-ray equipment into specified position and adjusts equipment controls to set exposure factors, such as time and distance, based on knowledge of radiographic exposure techniques and protocols
- Practices radiation protection techniques, using beam restrictive devices, patient shielding skills, and knowledge of applicable exposure factors, to minimize radiation to patient and staff.

(Lincoln/Till 001060.)   Gilliard's description of Plaintiff's duties includes the following responsibilities

- According to established procedures, prepares patients for radiography by transporting patient between waiting/patient room and x-ray room, ensuring proper identification of patient; assists patient with dressing and undressing and lifts patients onto and off examination table
- Properly positions patients in order to obtain desired radiographic results according to physician specifications; places restraint devices and protective lead shield on patient and briefly instructs patient on proper position for required exposure.
- Calculates and selects proper technical factors such as:  voltage, current, exposure time, and focal distance based on information such as patient's age, physical condition, and suspected pathology

- Selects and loads proper film cassettes and operates radiology equipment by manually activating proper switches and adjusts switches in order to regulate length and intensity of exposure
- Monitors patient condition during procedure for possible complications and administers emergency procedures in [sic] the need arises.

(Lincoln/Till 001095.) The only material difference is Gilliard's inclusion of the responsibility for "lift[ing] patients onto and off examination table." This difference is demonstrated in the difference in the physical requirements as noted by Dr. Kalen during her review of Plaintiff's medical records. (*See* Lincoln/Till 001065, 001068.) As defined by Gilliard, Plaintiff's occupation is a heavy physical capacity occupation, but as defined by the DOT, Plaintiff's occupation is a light physical capacity occupation. Plaintiff asserts that Lincoln's use of the DOT is unreasonable because it is outdated. (Doc. # 40, at 27–28.)

The Eleventh Circuit recently considered a similar situation in an unpublished decision. In *Stiltz v. Metro. Life Ins. Co.*, 244 F. App'x 260 (11th Cir. 2007), the plan defined "occupation" in a way that allowed the administrator to look beyond the "specific position," and the administrator relied upon the DOT to determine that the relevant occupation was "light-duty." *Id.* at 264. The claimant in *Stiltz* disagreed with this description of his occupation and argued that his occupation was more than light duty. *Id.* The Eleventh Circuit determined that the administrator was "entitled to rely on the [DOT]" and was "not *de novo* wrong" in

56

its interpretation of the plan and its decision that the claimant could perform his light-duty occupation. *Id.*

Although *Stiltz* is not binding, it is instructive on the reasonableness of Lincoln's reliance on the DOT. Based on *Stiltz* and the definition of "regular occupation" in the plan, the court finds that Plaintiff has not shown that Lincoln was arbitrary and capricious in its reliance on the DOT or its determination that Plaintiff's occupation was a light physical capacity occupation.[19]

### b.    Social Security Determination

Plaintiff argues that Lincoln's decision was arbitrary and capricious because it ignored the Social Security determination and vocational assessment. (Doc. # 40, at 25–26.) She insists that the Social Security's definition of disability is "***far*** more exacting than the 'own occupation' definition" in the policy. (Doc. # 40, at 26 (emphasis in the original).) She asserts that Lincoln's "disregard" of the Social Security decision, and particularly the vocational assessment, is arbitrary and capricious. (Doc. # 40, at 26; Doc. # 56-1, at 16–17.) Lincoln states that it did consider the Social Security determination; however, that determination "lacked any proof supporting Plaintiff's claim." (Doc. # 58, at 15.)

---

[19] This conclusion is technically correct in a strict view of precedent and the plan definition of "own occupation." But it risks making the court complicit in a bureaucratic time warp of an outdated definition, a regulatory trick typical of government-run agencies.

A favorable benefits determination by the Social Security Administration "is not considered dispositive on the issue of whether a claimant satisfies the requirement for disability under an ERISA-covered plan." *Oliver*, 613 F. App'x at 897 (citing *Whatley*, 189 F.3d at 1314 n.8). The Social Security Administration has its own set of policies and procedures it must follow when making benefits determinations, and these can substantially vary from an ERISA policy. *See id.* at 897–99 (discussing the differences between the Social Security process and the ERISA plan). One significant difference is that "[t]he Social Security law that greater weight must be given to the opinion of the treating physician is not applicable to the decision of a claims administrator of an ERISA-governed employee health plan. . . ." *Jett*, 890 F.2d at 1140; *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832–33 (2003) (noting "critical differences between the Social Security disability program and ERISA benefit plans [that] caution against importing a treating physician rule from the former area into the latter").

As discussed in the full and fair review analysis, Part IV.B.4., Plaintiff has not shown any evidence that the Social Security determination was disregarded or ignored. Lincoln not only reviewed the Social Security determination, but it explained its reasons for not following it in its letter denying Plaintiff's benefits after her second appeal. (Lincoln/Till 000078–79.) The letter includes a quote from Dr. Klingbeil's report that states that, during the Social Security medical

exam, Dr. Johnson did not perform a physical exam on Plaintiff, because she declined.  (Lincoln/Till 000078.)[20]  Notably, the Social Security determination gave "great weight" to Dr. Johnson's opinion.  (Lincoln/Till 000374.)  Based upon controlling precedent, Lincoln was not required to give the same deference to his opinion.  The court cannot say that it was unreasonable for Lincoln to determine that other medical evidence was due more weight than Dr. Johnson's opinion based on Lincoln's determination that Dr. Johnson did not perform a physical exam.[21]  The second appeal denial letter also explained that the Social Security determination was based on the Social Security Administration's plan provisions and independent information that was a separate consideration from Lincoln's decision.  Lincoln considered the Social Security award and medical examination and distinguished its decision from the Social Security grant of benefits.  The court finds that Plaintiff has not shown that Lincoln's decision was arbitrary and capricious based on its lack of consideration of the Social Security award letter and medical examination.

---

[20] Dr. Klingbeil did not fully contextualize Plaintiff's declination – "[s]he cried almost constantly during the evaluation, appeared to be is [sic] significant pain and appeared exhausted" (Lincoln/Till 000677) – in her report, but she had the benefit of the information.  She chose not to credit it.

[21] Analysis of the medical evidence and physical exams is discussed in the next section.

### c.   Opinions of Treating Physicians

Plaintiff contends that Lincoln should have given more deference to the opinions of the physicians who saw her in person rather than the independent physicians who only reviewed her file.  She cites two Ninth Circuit cases[22] in support of her assertion that "[i]t is well established that the opinions of treating physicians that are based on direct observations, examination, and clinical findings, are to be accorded greater weight than those of paper-reviewing doctors.[23]  (Doc. # 40, at 20–21.)  She argues that it was arbitrary and capricious for Lincoln to credit the reviewing physicians' opinions over the opinions of Plaintiff's treating physicians.  (Doc. # 64-1, at 7.)  Lincoln responds that the record shows that it and the independent physician reviewers considered all of the information in the record and that Plaintiff has "no basis for the conjecture that Lincoln or the independent physicians disregarded the opinions of treating physicians or any other medical documentation in the claim file."  (Doc. # 58, at 17.)

---

[22] *Solomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011); *Montour v. Hartold Life & Accident Ins. Co.*, 588 F.3d 623, 634 (9th Cir. 2009).

[23] Plaintiff also asserts that there were several procedural defects in Dr. Klingbeil's report.  (Doc. # 40, at 20 (citing Plaintiff's counsel's letter to Lincoln complaining about the review and report done by Dr. Klingbeil).)  Aside from the letter setting forth these allegations, Plaintiff has not provided evidence to support them.  Therefore, these allegations will not be further addressed.

In contrast to the Ninth Circuit[24] cases cited by Plaintiff, the Eleventh Circuit has held that an "administrator is not categorically required . . . to accept the opinions of the claimant's treating physicians over those of independent medical professionals who have reviewed the claimant's file but have not directly observed the claimant." *Oates*, 573 F. App'x at 909 (citing *Blankenship*, 644 F.3d at 1356); *see id.* at 909 n.17 (noting that in *Blankenship* the court applied *Black & Decker*, 538 U.S. at 834, to a conflict between treating physicians and physicians who had only reviewed the plaintiff's file).   In fact, the Eleventh Circuit has held that a district court erred by giving "special weight to the opinions of [the plaintiff's] treating physicians." *Shaw v. Conn. Gen. Life Ins. Co.*, 353 F.3d 1276, 1287 (11th Cir. 2003).   While an administrator may not arbitrarily ignore relevant medical evidence, it is not arbitrary and capricious to deny a disability claim "on the basis of conflicting, reliable evidence." *Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1199 (11th Cir. 2007) (citing *Shaw*, 353 F.3d at 1287).

Plaintiff has not provided evidence showing that the reviewing physicians' reports and opinions were unreliable.   Also, as discussed in the full and fair review analysis, Part IV.B.2., Plaintiff has not demonstrated that Lincoln ignored or disregarded any of the medical evidence in the administrative record.   Therefore,

---

[24] *See Turner v. Delta Family-Care Disability & Survivorship Plan*, 291 F.3d 1270, 1273–74 (11th Cir. 2002) (noting that the Ninth Circuit precedent requiring deference to opinions of treating physicians is contrary to the law of the Eleventh Circuit).

Lincoln's decision was not arbitrary and capricious based upon Lincoln's decision to accord greater weight to the opinions of the independent reviewing physicians.

### d.   Physical Exam Findings

Plaintiff insists that Lincoln "endeavored mightily to avoid acknowledging many 'physical exam findings' included in [her] ERISA record, including the many MRI studies and radiological reports and physician and physical therapy records . . . ." (Doc. # 40, at 19.)  Plaintiff makes several conclusory allegations including that Lincoln and the reviewing physicians "failed to actually *read* the vast majority of the medical records," "never actually considered [Plaintiff's records]," and "never read . . . the information sent on [Plaintiff's] behalf." (Doc. # 64-1, at 4–6 (emphasis in the original).)

Lincoln insists that its decision to deny Plaintiff benefits was reasonable and that Plaintiff cannot meet her burden of showing that it was arbitrary and capricious.  (Doc. # 58, at 20.)   Lincoln contends that Plaintiff has not cited evidence that Lincoln ignored any of the medical evidence and that she has failed to explain why the opinions of the reviewing physicians were unreasonable.  (Doc. # 58, at 20; Doc. # 62-1, at 5.)  Lincoln cites Plaintiff's physical therapy records, Dr. Lurate's notes, Dr. Kalen's report, and Dr. Klingbeil's report in support of its argument that it had a reasonable basis for its decision.  (Doc. # 62-1, at 6–7.)  It

argues that because it had a reasonable basis as supported in the record, the decision was not arbitrary and capricious.

It is clear from the administrative record and the parties' briefs that Lincoln and Plaintiff do not agree on the definition of "physical exam." Lincoln noted the lack of a physical exam in the record in each of its letters denying Plaintiff benefits. In the denial letter following the second appeal, Lincoln informed Plaintiff that her file "lack[ed] documentation showing abnormal physical examination findings." (Lincoln/Till 000079.) In the denial letter following the first appeal, Lincoln noted that the file contained "limited physical examination notes." (Lincoln/Till 001062.) In the denial letter for the initial claim, Lincoln stated that "[t]here is only one physical examination with the medical documentation in your file" and that "[t]here is a lack of sufficiently abnormal examination findings. . . ." (Lincoln/Till 001086.) Despite these repeated statements about a lack of physical exams, Plaintiff insists that the record shows "physical exam findings" in the form of her MRIs, x-rays, physician notes, and physical therapy notes that Lincoln "disregarded." (Doc. # 40, at 19.) Neither party defines "physical exam" in any of the briefs, but a review of the administrative record is enlightening.

The first letter Lincoln sent Plaintiff denying benefits contains a detailed discussion of the medical documentation in the file. (Lincoln/Till 001084–88.)

The letter noted that x-rays showed "multilevel disc disease in the lower and thoracic spine" and that an MRI showed spondylotic disease.  Most of the discussion concerned records from Dr. Lurate and the relevant portion states that during Plaintiff's first visit to Dr. Lurate "a physical examination revealed no evidence of scoliosis or paraspinal muscle spasm.  A poor voluntary range of motion of the back in flexion and extension is noted as well as hip rotation being well tolerated without pain.  A straight leg raise was found to be negative."  It goes on to discuss Plaintiff's second visit to Dr. Lurate and states that "[t]here were no physical examination findings noted."  (Lincoln/Till 001085.)  The summary portion of the letter explicitly notes that "[t]here is only one physical examination with the medical documentation in your file" and "[t]here is a lack of sufficiently abnormal examination findings in addition to a lack of documentation of any loss of strength, neurological deficits, or motor findings."  (Lincoln/Till 001086.)

A review of Dr. Lurate's notes from Plaintiff's two visits shows that on the first visit, he included a "PHYSICAL EXAM" section in the notes and did not include a similar section on the second visit.  Under the "PHYSICAL EXAM" section from December 18, 2012, Dr. Lurate indicated he had checked Plaintiff's range of motion with her back flexed and extended, had conducted a straight leg raise, a heel stretch, checked her reflexes in her knees and ankles, and had checked Plaintiff for a mass effect, scoliosis, and paraspinal muscle spasm.  His notes about

Plaintiff's MRI and x-rays are not included in this section, but are under the heading of "DIAGNOSTIC STUDIES." (Lincoln/Till 000891.)

Based upon this review of Lincoln's first determination letter and the medical records in the administrative record, it is clear that Lincoln does not include MRIs or x-rays within its definition of "physical exam." This is demonstrated because the letter discussed the results of the MRIs and x-rays, but noted that there was only one physical exam. This fact is supported by the subsequent denial letters. In the first appeal denial letter, in a paragraph discussing Plaintiff's MRIs, the letter also states that "[n]o formal physical examination is noted" and "no formal examination was recorded." (Lincoln/Till 001061.) In the second appeal denial letter, Lincoln again noted that "the file lacks documentation showing abnormal physical examination findings. There is no indication for a loss of motor sensory deficits, loss of coordination or range of motion, loss of strength, or other specific deficits. The file does not show that [Plaintiff] is functionally impaired or that she would have restrictions or limitations." (Lincoln/Till 000079.) The letter also quoted from Dr. Klingbeil's report, noting that "[p]hysical exam was not performed as the claimant declined." (Lincoln/Till 000078.)

As stated in the full and fair review analysis, in Part IV.B.2., Plaintiff has not demonstrated that Lincoln ignored or disregarded any of her medical records. Lincoln has consistently stated that the medical documentation lacks physical

exam findings, and Plaintiff has not shown that this consistent statement is a manipulation of the evidence or an attempt to avoid a finding of disability.   The MRIs, x-rays, doctors' notes, and physical therapy notes were all reviewed and discussed in the letters denying Plaintiff's appeals and by Dr. Kalen and Dr. Klingbeil in their respective reports.   The fact that Lincoln does not term the MRIs, x-rays, and doctors' notes to be "physical exam findings" does not mean that they were not reviewed and considered.   Plaintiff has not cited and the court has not discovered any evidence that supports a finding of disability that was not considered by Lincoln.[25]   Lincoln did not unreasonably ignore or disregard the physical exam findings in the medical documentation.

### e.    Reasonable Basis

Lincoln asserts that its decision denying Plaintiff benefits was not arbitrary and capricious because the evidence in the record and the opinions of the two independent reviewing physicians provide a reasonable basis for the decision. (Doc. # 37, at 16.)   Lincoln argues that the medical documentation shows that Plaintiff was being treated for her back problems and demonstrated that her back

---

[25] The court notes that Lincoln stated in the denial letter following the second appeal that there was no finding of a loss of strength.   (Lincoln/Till 000079.)   However, Dr. Johnson indicated that Plaintiff's grip strength was fifteen pounds in her right hand and five pounds in her left hand.   (Lincoln/Till 000677.)   Dr. Voreis also indicated that her grip strength was at three and a half out of five.   (Lincoln/Till 000690.)   Because Dr. Klingbeil reviewed the documentation containing both of these statements and the denial of the second appeal was based on more than lack of evidence demonstrating a loss of strength, the court does not find that these statements change its analysis.

was improving prior to the end of the elimination period.  (Doc. # 58, at 10–11.) Plaintiff asserts that she is "disabled as a matter of law," but does not provide support for the "matter of law" claim of this conclusory proposition.  (Doc. # 40, at 14–15.)  However, in many of her arguments, she relies on the opinions of Dr. Voreis and Dr. Johnson, both of whom conclude that she is unable to work.  (*See, e.g.*, Doc. # 56-1, at 13–15.)

Dr. Voreis and Dr. Johnson both indicated that Plaintiff is disabled and unable to work.  (Lincoln/Till 000677, 000696.)  In the letter denying Plaintiff's initial claim and the letter denying benefits after the first appeal, Lincoln noted that there were no notes from Dr. Voreis that provided a history or exam that would support his opinion of Plaintiff's restrictions and limitations.  (Lincoln/Till 0001061–62, 001085.)  In the letter denying benefits after the second appeal, Lincoln indicates that neither Dr. Voreis nor Dr. Johnson performed a physical exam of Plaintiff.  (Lincoln/Till 000078.)  Lincoln also indicates that Dr. Voreis's opinion is not supported by clinical findings.  (Lincoln/Till 001062.)

The restrictions indicated by Dr. Voreis in March 2013 are similar to those indicated by Dr. Kalen upon review of Plaintiff's file during the first appeal.  On the March 4, 2013 abilities form, Dr. Voreis indicated that Plaintiff could occasionally carry up to twenty pounds, sit, stand, walk, bend, drive, finger, handle, operate foot controls, and climb a few steps, but never kneel.  (Lincoln/Till

001090.)  Dr. Kalen's restrictions indicated that Plaintiff could lift up to ten pounds frequently and up to twenty-five pounds occasionally and only bend at the waist occasionally.  (Lincoln/Till 001066–67.)  Dr. Kalen agreed that Plaintiff could not work in a heavy duty physical capacity, but Lincoln's decision was based on Plaintiff's occupation being a light duty occupation.

Dr. Voreis changed his opinion of Plaintiff's needed restrictions based on his March 2014 assessment.  He examined the same MRIs from December 2012 and January 2013 during the assessment, but determined that different restrictions were appropriate.  (Lincoln/Till 000689, 000692.)  However, he did not explain the basis for this change in opinion.  Also, despite his opinion that Plaintiff was unable to work, he only indicated that she would be absent from work for up to four days per month based on her impairment.  The form had an option for him to indicate that she would miss more than four days per month, but he did not indicate that she would need to miss work that frequently.  (Lincoln/Till 000696.)

Nurse Bruemmer, Dr. Kalen, and Dr. Klingbeil each reviewed Plaintiff's file and reached conclusions different from those of Dr. Voreis and Dr. Johnson.  (Lincoln/Till 000016, 000663–67, 001065–69.)   Plaintiff has not identified significant medical evidence that supports Plaintiff's impairment that was not considered by Lincoln or one of its reviewers.  Lincoln consistently found a lack of abnormal physical exam findings in Plaintiff's medical records, and because it had

discretion to determine whether Plaintiff was disabled, it is not unreasonable for it to require abnormal physical exam findings. *See Wangenstein*, 191 F. App'x at 913–14 (holding that an administrator with discretion "in terms of what it considers adequate 'proof' of continuing disability" is not unreasonable to require objective evidence).

A decision to deny benefits is not arbitrary and capricious when it is based on a review by a registered nurse and two board-certified independent medical consultants. *See Keith v. Prudential Ins. Co. of Am.*, 347 F. App'x 548, 551 (11th Cir. 2009). Nothing in the record demonstrates that the opinions of Nurse Bruemmer, Dr. Kalen, and Dr. Klingbeil are unreliable. It is not unreasonable for Lincoln to deny Plaintiff's claim based on conflicting but reliable evidence. Lincoln explained its reliance on its reviewers based on the lack of objective physical examination findings by the treating physicians. Therefore, the court concludes that Lincoln had a reasonable basis on which it relied to deny Plaintiff's benefits, and its decision was not arbitrary and capricious.

### 4. *Conflict of Interest*

Plaintiff argues that Lincoln's decision was tainted by a conflict of interest and that in the absence of the conflict, Lincoln would have reached a decision favorable to her. (Doc. # 40, at 17–18; Doc. # 56-1, at 21–24.)

When a claim administrator both funds the plan and evaluates claims, it operates under a conflict of interest. *Glenn*, 554 U.S. at 114. Where a conflict exists and a court weighs the conflict in the sixth step of the analysis, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Blankenship*, 644 F.3d at 1355 (citing *Doyle*, 542 F.3d at 1360) (internal quotation marks omitted) (noting that even a claim for half a million dollars "is a relative amount when the plan administrator is global"). "The effect that a conflict of interest will have within the *Williams* analysis in any given case will vary according to the severity of the conflict and the nature of the case:  [A court should] look to the conflict's 'inherent or case-specific importance.'" *Id.* (quoting *Glenn*, 554 U.S. at 117).

When an administrator is vested with discretionary authority under a plan, even in the presence of a conflict of interest, courts "owe deference" to that "discretionary authority." *Doyle*, 542 F.3d at 1363. A structural conflict of interest is "a factor" in the analysis, "but the basic analysis still centers on assessing whether a reasonable basis existed for the administrator's benefits decision." *Blankenship*, 644 F.3d at 1355. A structural conflict of interest is unremarkable in today's marketplace, and the existence of the conflict is not "a license, in itself, for a court to enforce its own preferred *de novo* ruling about a benefits decision." *Id.* at 1356.

70

Plaintiff has not demonstrated that the structural conflict of interest influenced Lincoln's determination of her claim. She insists that because the employees' annual bonuses are based on corporate profitability and a denial of a disability claim adds dollars to the company's bottomline that implies that these employees must be motivated by denying claims. (Doc. # 56-1, at 23.) This connection is tenuous at best. As the Eleventh Circuit has noted, "most insurers are well diversified, so that the decision in any one case has no perceptible effect on the bottom line. There is correspondingly slight reason to suspect that they will bend the rules." *Blankenship*, 644 F.3d at 1357 (quoting *Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004)) (internal quotation marks omitted). "While it is true that every dollar not paid to a beneficiary is a dollar saved by [Lincoln] in the short run, other factors and different business considerations may be in play." *Id.* A review of the evaluations of the employees demonstrates that their employee reviews were based on more than just denying or closing claims. Lincoln had many detailed performance metrics it used in the evaluations. The reviews do not demonstrate a bias in claims determinations. (*See* Doc. # 57-1.)

Because Plaintiff has not pointed to evidence in the record suggesting that Lincoln has a "history of biased claims administration," the structural conflict in this case has little weight. *See Doyle*, 542 F.3d at 1362 (quoting *Glenn*, 554 U.S. at 116). The conflict is a factor to consider in the determination of the outcome,

71

but Lincoln is vested with discretion to make benefits decisions under the plan and is therefore owed deference.   Although there is conflicting medical evidence, Lincoln has demonstrated a reasonable basis for its decision, and even in the presence of the conflict, the court cannot say that Lincoln's decision to deny Plaintiff benefits was arbitrary and capricious.   *See id.*   Because the decision to deny long term disability benefits was not arbitrary and capricious, Lincoln is entitled to summary judgment on Plaintiff's § 502(a)(1)(B) claim to recover benefits.

### D.     Penalties Under § 502(c)(1)(B)

Section 502(c)(1) of ERISA provides that

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . may[,] in the court's discretion[,] be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may[,] in its discretion[,] order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1).[26]   The Eleventh Circuit held in an unpublished decision that "[a] plan administrator is either 'the person specifically so designated by the terms of the instrument under which the plan is operated,' . . . or a company acting as a plan administrator."   *Lockhart v. Blue Cross Blue Shield of Tenn.*, 503 F. App'x 926, 928 (11th Cir. 2013) (internal quotations and citations omitted).

---

[26] The daily penalty has increased from $100 to $110.  29 C.F.R. § 2575.502c–1.

The Eleventh Circuit recognizes the *de facto* plan administrator doctrine, but limits application of the doctrine to employers seeking to avoid liability as plan administrators.  It declined to apply the *de facto* administrator doctrine to third party administrative services providers.  *Oliver*, 497 F.3d at 1194–95.  This court has also rejected application of the *de facto* plan administrator doctrine to a claims administrator based on the express language of ERISA.  *Poole v. Life Ins. Co. of N. Am.*, 984 F. Supp. 2d 1179, 1192 (M.D. Ala. 2013).

Plaintiff's only argument about application of the *de facto* plan administrator doctrine is that the earlier denial of Lincoln's motion to dismiss warrants the imposition of § 502(c)(1)(B) penalties against Lincoln.  The court's previous finding that "[t]he question of whether a defendant is acting as plan administrator is [a] fact intensive [issue that is] better decided at a later stage of this litigation" (Doc. # 21, at 15) does not end the inquiry.  This is the later stage of the litigation.

The Summary Plan Description designates Gilliard as the plan administrator.  Plaintiff has not provided evidence to the contrary and has only made conclusory statements that Lincoln is the *de facto* plan administrator.  Because the *de facto* plan administrator doctrine does not apply to third-party administrators and because no evidence supports a finding that Lincoln is a *de facto* plan administrator, § 502(c)(1)(B) penalties are inappropriate.  Lincoln is entitled to summary judgment on Plaintiff's § 502(c)(1)(B) claim.

## V.  CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

(1)    Plaintiff's Motion for Summary Judgment (Doc. # 39) is DENIED;

and

(2)    Lincoln's Motion for Judgment as a Matter of Law (Doc. # 36) is

GRANTED.

A separate final judgment will be entered.

DONE this 25th day of April, 2016.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE